UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                  Case No. 12-20114

WILLIAM SPANN,

          Defendant.

## MEMORANDUM AND ORDER

### I.    Introduction

The ultimate outcome of this probation-violation matter hinges largely on the meaning of the verb "hunt." This is something the defendant, William Spann, who's a professional big-game hunter, was specifically prohibited from doing anywhere in the United States for six months following his recent conviction in this court on a deer-hunting offense.

On June 27 and 28, 2013, the undersigned U.S. Magistrate Judge, James P. O'Hara, conducted an evidentiary hearing under Rule 32.1 of the Federal Rules of Criminal Procedure. The plaintiff, United States of America, appeared through Assistant U.S. Attorney D. Christopher Oakley. Mr. Spann, more commonly known as "Spook" Spann, appeared in person and through counsel, John C. Aisenbrey and Misty Cooper Watt. The court appreciates the prehearing memoranda submitted by counsel, as they

were helpful in framing the issues, both factually and legally.[1]  The court heard detailed sworn testimony from five witnesses for the government, and another ten for the defense (including Mr. Spann)—the case was well presented from both sides of the aisle.  After the evidentiary hearing, counsel filed proposed findings of fact and conclusions of law to further clarify the issues.[2]  Oral argument was heard on July 17, 2013; during this second hearing, Mr. Spann elected to present information in mitigation through his attorney instead of testifying again.  The court is prepared to rule.

## II.    Background

As reflected by the presentence investigation report, since approximately 2007 or 2008, Mr. Spann has been self-employed as a professional hunter, operating out of Tennessee.[3]  Mr. Spann has been and continues to be involved in a variety of business ventures, some big and some small, but most notably he produces and is the host of a popular television hunting show, "Spook Nation."  This show started around 2009 and is available twice weekly through nationally syndicated cable outlets.  Mr. Spann purchases the time for his show from the cable outlets, but receives substantial income from various hunting-related sponsors that considerably exceeds his claimed losses on actual hunting activities.

On November 27, 2012, pursuant to a written agreement with the government under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, Mr. Spann pleaded

---

[1] Docs. 33 and 35.
[2] Docs. 39-41.
[3] Doc. 23.

guilty to violating the federal wildlife conservation law known as the Lacey Act of 1900,[4] i.e., unlawful transportation in interstate commerce of unlawfully taken wildlife.[5] This is a Class A (the highest level) misdemeanor. More specifically, and as reflected by the presentence investigation report, Mr. Spann admitted that he shot a trophy-quality deer in Kansas by bow and arrow without first securing the necessary hunting license and later transported the deer's antlers back to Tennessee.[6] Mr. Spann had a videographer film the hunt for the deer, and he made commercial use of that video. Mr. Spann, in pleading guilty, took the position that he had no intent to break the law by shooting the deer in Kansas—he acknowledged that at a minimum he had been negligent, i.e., that he "did not exercise due care in investigating what deer license he needed."[7]

On November 29, 2012, consistent with the parties' plea agreement, the government voluntarily dismissed two felony charges which had originated this case and exposed Mr. Spann to five-year prison terms and fines totaling $270,000.[8] On February 28, 2013, after reviewing the presentence investigation report prepared by the probation office, the court decided to accept the parties' "11(c)(1)(C)" plea bargain, and thus declined to impose *any* prison time—instead, Mr. Spann was sentenced to three years of probation, ordered to pay a $10,000 fine, and required to pay an additional $10,000 in

---

[4] 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(2).
[5] *See* docs. 15-18.
[6] *Id*.
[7] Doc. 24 at 5.
[8] *See* docs. 1, 19, and 20.

restitution to the Kansas Department of Wildlife, Parks, and Tourism.[9] As conditions of his probation, among other things, Mr. Spann was ordered not to hunt anywhere in the United States for six months from the date of sentencing (i.e., until August 28, 2013) and, as required of all probationers, ordered not to commit any federal, state, or local crime.

Significantly, the following colloquy occurred at the conclusion of the February 28, 2013 sentencing hearing:

The Court:

> In closing, Mr. Spann, I simply want to reiterate what I think we visited about briefly at the initial appearance in this case. Since I don't know whether any violation of the term of probation and supervision will come back to me or the judge in Tennessee, I simply want to be real clear about the way it works in my court. I expect defendants in my court to be in strict, complete compliance with the conditions of release. So, if you have questions about what you are permitted to do, whether it has to do with ***hunting***, advertising for hunting, or otherwise, I strongly suggest you call Mr. Aisenbrey and Ms. Watt and also your supervising probation officer to get advance clearance. If you assume that you're entitled to do something and you make the incorrect conclusion, as it's your view that you did in this case, you will [sic] staring down the barrel of a motion to revoke the probation, which could result in custodial terms. Are we clear on that?

Mr. Spann:

> Yes, sir.[10]

Mr. Spann admits he understood on the date he was sentenced that the restrictions imposed by the court on his hunting activities for the specified period was a very

---

[9] Doc. 28.

[10] Partial transcript of Sentencing Hearing (doc. 43 at 2 (emphasis added)).

4

important if not the most important term of the sentence.[11]

On June 10, 2013, Mr. Spann's supervising probation officer filed a petition alleging Mr. Spann had violated his probation by: (1) hunting; and (2) committing a state crime, specifically, violating Tennessee law by "baiting" fields within ten days of hunting turkeys.[12]  The violations stemmed from alleged conduct that began on March 30, 2013, i.e., about one month from the date on which Mr. Spann was sentenced.  The petition recommended that Mr. Spann's probation be revoked.

Mr. Spann disputes the government's contention that while on probation he ever did any "hunting," at least as he claims to understand that term.  Mr. Spann also denies that he has ever baited turkeys in violation of Tennessee law.  Finally, even assuming the court finds Mr. Spann technically violated the conditions of his probation as alleged by the government, he asserts that his probation shouldn't be revoked and, in any event, the previously mentioned restriction on his hunting activities shouldn't be extended but minimally.

### III.    Findings of Fact

This, of course, is a criminal matter.  But the stringent standard of "proof beyond a reasonable doubt" that applies at criminal trials doesn't apply here.  That is, with Mr. Spann now before the court as a convicted individual, the government need only prove one or more of the alleged probation violations "by a preponderance of evidence," i.e.,

_____

[11] Tr. Vol. 2 at 116.
[12] Doc. 30.

the less arduous standard that typically applies in a civil case.[13]

The Federal Rules of Evidence do not apply at a probation-violation hearing.[14] Thus, the court may consider reliable hearsay evidence.[15]

The evidence presented during the hearing on June 27 and 28, 2013, was highly conflicting in most material respects. As a practical matter, the court has been called upon to determine and weigh the relative credibility of each of the fifteen witnesses who provided sworn testimony. This is especially so with regard to the baiting allegation and the total conflict between the testimony of Mr. Spann and that of his former videographer and principal accuser, Thomas Southerland.

Based on a preponderance of the evidence presented, the court finds that the material facts of this case are as follows:

Agents of the Tennessee Wildlife Resource Agency ("TWRA") and the United States Fish and Wildlife Services ("USFWS") opened an investigation of Mr. Spann's activities during Tennessee's spring 2013 turkey season, which started on March 30, 2013.[16] As part of their investigation, TWRA and USFWS agents placed numerous surveillance cameras on three parcels of land which Mr. Spann owned or at least had

---

[13] *See Morishita v. Morris*, 702 F.2d 207, 210 (10th Cir. 1983); *see U.S. v. Acosta*, 480 F.App'x. 923, 925 (10th Cir. 2012) (a district court may revoke a term of supervised release if it "finds by a preponderance of the evidence that the defendant violated a condition of supervised release").

[14] Fed. R. Evid. 1101(d)(3).

[15] *U.S. v. Reed*, 15 F.App'x. 641, 642-43 (10th Cir. 2001) (citing *U.S. v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994) and *U.S. v. Waters*, 158 F.3d 933, 940 (6th Cir. 1998)).

[16] Tr. Vol. 1 at 163.

rights of access to for hunting purposes. These are commonly known in the community and referred to by the parties as "the Graveyard," "the Sawmill," and "the Park;"[17] the Park is also sometimes called "Uncle Connor's" (or "Uncle Karner's") property."[18]

On March 30, 2013, Mr. Spann drove another hunter, Travis Faulkner, Mr. Faulkner's son James, one of James' friends, and Mr. Faulkner's cameraman to one of Mr. Spann's properties so they could hunt turkeys. Mr. Spann told the group where the property lines were, led them into the woods to show them where they could go, and stayed behind them during the hunt.[19] Eventually, James shot and killed a turkey.[20] The same day, Mr. Faulkner posted a picture on Facebook of Mr. Spann with James and Travis Faulkner and the turkey James had killed.[21] In the photo, Mr. Spann is wearing camouflage.[22] Additionally, on April 1, 2013, Mr. Faulkner posted the following comment on Facebook: "We had a blast on this hunt with Spook. Can't wait to do it again."[23]

On April 2, 2013, Alex Rutledge, who's a professional turkey hunter, accompanied members of the music group "Bush Hawg" to hunt turkeys at the Graveyard.[24] Mr. Rutledge had called Mr. Spann for permission to hunt on his

---

[17] *Id.* at 163-64.
[18] *Id.* at 63.
[19] *Id.* at 293-95.
[20] *Id.* at 294.
[21] *Id.* at 295; Govt. Ex. 4.
[22] Govt. Ex. 4.
[23] Tr. Vol. 1 at 296-97; Govt. Ex. 6.
[24] Tr. Vol. 1 at 340-41.

properties, and Mr. Spann responded, "Yeah, sure … I think I can put you on some turkeys."[25]  Mr. Spann met the group, took them to the Graveyard, showed them the property and the property lines, and said, "I'll tag along and just do your thing."[26]  The same day, Mr. Rutledge posted on his Facebook Page, "hunted with RCA recording artist Bush Hawg and we hooked up with Spook Spann, what a great host that he was.  Don't ever think Spook don't know turkeys too."[27]

On April 4, 2013, a mobile posting to Mr. Spann's Facebook page said, "Turkeys ain't talking to me today.  Really hurts."[28]  Other postings to Mr. Spann's Facebook page that day said "Cold, windy, wet" in response to a question, and "TN" in response to a question asking in which state he was hunting.[29]

Mr. Spann testified that he does not post any information on Facebook, he does not know how to log on to the system, and others operate his page for him.[30]  His wife, "Marty" Spann, testified to the same effect.

On April 5, 2013, Mr. Spann purchased five bags of scratch grain feed from a feed store.[31]  As of this date, Thomas Southerland, who had been Mr. Spann's videographer and general employee for about five years, was in the process of helping a new videographer assume his duties.  Mr. Southerland met Mr. Spann at the feed store to pick

---

[25] *Id.* at 342.
[26] *Id.*
[27] Govt. Ex. 7.
[28] Govt. Ex. 10.
[29] *Id.*
[30] Tr. Vol. 2 at 20.
[31] Govt. Ex. 31.

up the scratch grain.[32]  Mr. Spann had more bags of feed in his truck.[33]  According to Mr. Southerland, he was directly told by Mr. Spann to place the purchased feed out at two properties—two bags of feed at the Graveyard (in the left-hand corner of the property where turkeys always come), and two bags of feed at Uncle Connor's.[34]  Significantly, it is undisputed that Mr. Spann had actual knowledge at this time that, under Tennessee law, any bait (whether scratch grain or otherwise) had to be removed from a property at least ten days before hunting wildlife there.

According to Douglas Hall, the owner of the feed store, Mr. Spann told Mr. Southerland to put two bags of feed on Uncle Connor's property and that Mr. Spann would take the other three to his house to feed geese.[35]  Mr. Hall doesn't recall Mr. Spann saying anything to Mr. Southerland about taking grain to the Sawmill or the Graveyard.[36]  In any event, Mr. Hall doesn't know what happened with any of the feed once it left his store.[37]

Later the same day, Mr. Southerland is seen on surveillance cameras at the Graveyard spreading bait.[38]  Mr. Spann admits that he knew at the time in question that, *if* in fact he had instructed Mr. Southerland to bait the Graveyard within ten days of allowing that ground to be hunted, that conduct was specifically prohibited by Tennessee

---

[32] Tr. Vol. 1 at 57, 61.

[33] *Id.* at 62.

[34] *Id.* at 62-63.

[35] *Id.* at 98, 105.

[36] *Id.*

[37] *Id.* at 103.

[38] *Id.* at 172-74; Govt. Ex. 11.

law.[39]

Surveillance-camera footage at the Sawmill also shows Mr. Spann's truck enter the Sawmill, Mr. Spann remove an item from the back of his truck, and then Mr. Spann toss something onto the ground.[40] Mr. Spann claims he was freshening up "mineral licks" for deer on the Sawmill.[41] There's nothing illegal about a mineral lick. But, the following day, government agents physically documented turkey bait at the Graveyard *and* the Sawmill.[42] Agents also physically documented bait at the Sawmill on April 8, 2013.[43]

On April 12, 2013 (i.e., within ten days of Mr. Southerland distributing scratch grain at the Graveyard per Mr. Spann's directive), Jake Locker and Rusty Smith, quarterbacks with the National Football League's Tennessee Titans, went turkey hunting at the Graveyard.[44] These professional football players were in town to participate in a local muscular dystrophy charity function with which both Mr. Spann and his wife were heavily involved.[45] Mr. Spann accompanied Messrs. Locker and Smith during their turkey hunt, and Mr. Spann was dressed in camouflage and carried a turkey decoy.[46] Mr. Spann set up that decoy for Messrs. Locker and Smith in the field being hunted at

---

[39] Tr. Vol. 2 at 39-41.
[40] Tr. Vol. 1 at 175-77; Govt. Ex. 11.
[41] Tr. Vol. 2 at 18.
[42] Tr. Vol. 1 at 134; Govt. Ex. 3.
[43] Govt. Ex. 3.
[44] Tr. Vol. 1 at 32.
[45] *Id.* at 275-76.
[46] Tr. Vol. 2 at 49-50.

approximately 7:11 a.m.[47]  Mr. Locker shot and killed a turkey less than ten minutes after Mr. Spann set up the turkey decoy.[48]  Mr. Spann admits that setting up a decoy can be an effective tool to attract a turkey and also admits that doing so that day was part of the hunt.[49]

During the Locker-Smith hunt, Mr. Spann physically possessed a mechanical, hand-held device often used by hunters to "call" turkeys (by imitating a turkey's gobbling), but Mr. Spann denies he used that device *before* Mr. Locker shot his turkey.[50]  Mr. Spann does admit to calling *after* Mr. Locker shot his turkey.[51]  Mr. Spann testified that he knows that occasionally "tom" (i.e., adult male) turkeys will attack another tom that has been shot, giving other hunters an opportunity to shoot more turkeys.[52]  However, Mr. Spann denies his calling was part of the hunt and testified the purpose of his calling after Mr. Locker took his turkey was to calm the other turkeys down because he was concerned for their emotional well-being.[53]  Mr. Spann's testimony in this regard begs credulity.

Later that morning, Mr. Smith also shot and killed a turkey at the Park.[54]  Mr. Spann was present when Mr. Smith shot and killed the turkey and retrieved it from where

---

[47] *Id.* at 51.
[48] *Id.* at 58-59.
[49] *Id.* at 51, 58-59.
[50] *Id.* at 50, 52.
[51] *Id.* at 56.
[52] *Id.* at 55-56.
[53] *Id.* at 56-57.
[54] *Id.* at 65.

it finally died in the adjoining state-park property.[55]

TWRA Officer Shawn Karns testified concerning his later interview of Mr. Locker about the April 12, 2013 hunt at the Graveyard.[56] Mr. Locker told Officer Karns that Mr. Spann called turkeys during the hunt, including initially mimicking an owl hoot which is often used as a locator call for turkeys.[57] Mr. Spann conceded during his testimony that he knew of no reason why Mr. Locker would lie to fish and game officials to try to incriminate Mr. Spann.[58] Mr. Spann did not call Mr. Locker as a witness to rebut Officer Karns' account of the above-described interview.

Officer Karns also testified about his interview of Jason Dotson (also known as "J.D."), the videographer who had been hired to replace Mr. Southerland and who filmed the April 12, 2013 hunts at the Graveyard and the Park by Messrs. Locker and Smith. During this interview, Mr. Dotson told Officer Karns that Mr. Spann had called turkeys during the hunt and that Mr. Spann generally directed the hunt as neither Mr. Locker nor Mr. Smith had been to those hunting locations before.[59] According to Officer Karns, Mr. Dotson never said anything during this interview about Mr. Spann's calling being staged or recreated as part of post-kill "cutaway" filming.[60] However, when called as a witness to testify on Mr. Spann's behalf, Mr. Dotson equivocated about the extent of what he

---

[55] *Id.* at 65-66.
[56] Tr. Vol. 1 at 34.
[57] *Id.* at 34-35.
[58] Tr. Vol. 2 at 45.
[59] Tr. Vol. 1 at 37-38.
[60] *Id.*

could see and hear, what he actually saw and heard during the Locker-Smith hunt, and whether any calling done by Mr. Spann was part of a post-kill "cutaway."[61]

Mr. Dotson's belated equivocation during the recent evidentiary hearing about what he told Officer Karns isn't credible. Notably, the record contains an e-mail dated March 22, 2013, that Mr. Dotson sent to Mr. Spann, stating in pertinent part: "I want you to know and trust me that things that happen in the field will stay in the field. No talking out of school and no Kansas BS ever again."[62] The court realizes that persons seeking or starting new jobs frequently and understandably seek to engender their employer's trust and confidence. Here, though, Mr. Dotson holds to the very firmly stated view that Mr. Spann was wrongly convicted of the deer-hunting charge in this court.[63] While surely everyone's entitled to his own opinion on such matters, given the history of Mr. Southerland's predecessor, who Mr. Dotson knew had reported Mr. Spann's unlawful conduct in Kansas to wildlife officials in connection with the deer-hunting offense,[64] the *only* reasonable construction of this e-mail is that Mr. Dotson is comfortable with trying to conceal from wildlife authorities (and in turn the court) whatever violations of the law Mr. Spann might have committed.

On April 12, 2013, Jerious Norwood, a hunting friend of Mr. Spann's who was in town for the same charity event as Messrs. Locker and Smith, went turkey hunting on Mr.

---

[61] *Id*. at 307, 317.
[62] *Id*. at 320; Govt. Ex. 34.
[63] Tr. Vol. 1 at 321-22.
[64] *Id*. at 321.

Spann's property with Mr. Southerland.[65]  The next day, Mr. Spann joined Messrs. Norwood and Southerland on their hunt at the area surrounding Mr. Spann's home, and also at the Sawmill and the Graveyard.[66]  Mr. Norwood was hunting, Mr. Southerland was filming, and Mr. Spann directed where they should go.[67]  No one killed a turkey, but Mr. Spann did show Messrs. Norwood and Southerland where to sit to try to find one.[68]

On April 20, 2013, surveillance-camera footage shows Mr. Spann's truck back into an area at the Sawmill, two men get out of the truck, and one of them take something and make a motion with his arm.[69]  Mr. Spann testified that he was working a mineral lick.[70]  However, this occurred in the exact location where law enforcement officers found bait.[71]

Additional surveillance-camera footage from that day shows Mr. Spann and his son at the Graveyard.[72]  In the video, Mr. Spann's son carries something across the field that appears to be a bag of feed.[73]  Another camera located at the Graveyard captured Mr. Spann who stepped out of view of the camera just before a substance is shown flying through the video frame.[74]  Government agents found scratch feed on the ground in the

---

[65] *Id.* at 65-67.
[66] *Id.* at 67.
[67] *Id.* at 68.
[68] *Id.* at 88.
[69] *Id.* at 190; Gov. Ex. 15-A.
[70] Tr. Vol. 2 at 18-19.
[71] Tr. Vol. 1 at 191.
[72] Tr. Vol. 2 at 192-93.
[73] Tr. Vol. 1 at 193; Govt. Ex. 15-B.
[74] Tr. Vol. 1 at 196-97; Govt. Ex. 15-B.

same area.[75]  However, Mr. Spann claimed the bag observed in the video was not scratch feed, but rather mineral lick and the substance flying into the view of the camera was mineral he was shaking out of the bag.[76]

On April 22, 2013, government agents reported that they recovered scratch feed from the Sawmill and the Graveyard.[77]

On or around April 22, 2013, Mr. Spann's attorney, Mr. Aisenbrey, e-mailed Mr. Spann a copy of the Tennessee statute that defines "hunting."[78]  Mr. Spann's conduct changed after this.

On April 24-25, 2013, Brian Stephens and Billy Lawson hunted on Mr. Spann's property.[79]  On the first day of the hunt, Mr. Spann showed Messrs. Stephens and Lawson where they could hunt, including the boundaries of the state park.[80]  At the end of the hunt that day, Mr. Spann picked them up.[81]  The second day, Mr. Spann dropped Mr. Stephens and Mr. Dotson off at the Sawmill to hunt.[82]

On May 1, 2013, Mr. Spann sent a text message to David Welch, an occasional cameraman and employee of Mr. Spann.[83]  In the text, Mr. Spann asked "R u huntin

---

[75] Tr. Vol. 1 at 197.
[76] Tr. Vol. 2 at 14.
[77] Govt. Ex. 3.
[78] Tr. Vol. 2 at 130-31.
[79] Tr. Vol. 1 at 108, 110.
[80] *Id.* at 112.
[81] *Id.* at 117.
[82] *Id.* at 118.
[83] *Id.* at 28; Govt. Ex. 20.

any?"[84] Mr. Welch responded, "No, not much. Been to busy this year. Why you need somebody to film?"[85] Mr. Spann responded, "No. Just wondering if anyone else is hearing anything. My turkeys have completely stopped gobbling."[86] Mr. Welch replied, "Our birds are doing ok. Not really hammering but pretty good. How many y'all killed? We've got 7 on film so far."[87] Mr. Spann responded, "Well I haven't been any since billy [Lawson] and brian [Stephens] left except just takin [my son] out couple times but he hasn't' heard a gobble in two days and gobblers r all around him strutting."[88]

On May 2, 2013, Scott Esker and his brother hunted at the Sawmill with Messrs. Spann and Dotson.[89] Mr. Spann showed them the property lines and where they could and could not go.[90] Mr. Esker testified that the group went down to the blinds and Mr. Spann showed them everything.[91] Mr. Esker's brother made some turkey calls, Mr. Dotson filmed, and Mr. Spann also filmed using a second camera.[92]

## IV. Conclusions of Law

As earlier indicated, the government specifically asserts Mr. Spann violated his probation by: (1) hunting; and (2) baiting turkeys in violation of Tennessee's hunting laws. The government's proffered evidence in support of these allegations includes Mr.

---

[84] Govt. Ex. 20.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] Tr. Vol. 1 at 351.
[90] *Id.* at 352.
[91] *Id.*
[92] *Id.*

Spann's purchase of large amounts of turkey bait; Mr. Spann's distribution of the bait; and extensive surveillance video of Mr. Spann wearing camouflage, a turkey vest, and binoculars, and holding a decoy bag while exiting a hunting location, along with surveillance video of Mr. Spann dressed in camouflage exiting a hunting location with a dead turkey in hand. The government concedes there's no evidence that Mr. Spann ever pulled the trigger on a gun pointed at a turkey during his probationary period—indeed, the government concedes there's no evidence that Mr. Spann even carried a gun in a hunting field since he was placed on probation. But the government still asserts Mr. Spann "hunted," by "calling turkeys, carrying hunting equipment, carrying dead turkeys, and placing feed" on hunting locations.[93]

"Generally, conditions of probation and supervised release are interpreted 'in light of common sense.'"[94] "Thus, 'conditions of probation do not have to be cast in letters six feet high, or describe every possible permutation, or spell out every last, self-evident detail.'"[95] "Instead, sentencing courts may 'use categorical terms to frame the contours of supervised release conditions,' and '[s]uch categorical terms can provide adequate notice of prohibited conduct when there is a commonsense understanding of what

---

[93] Doc. 33 at 5.

[94] *U.S. v. Smith*, No. 08-po-6015-01, 2008 WL 5114216, at *2 (W.D. La. Nov. 24, 2008) (citing *U.S. v. Garcia-Mejia*, 394 F.3d 396, 397-98 (5th Cir. 2004), *cert. granted and judgment vacated on other grounds*, 545 U.S. 1102 (2005)).

[95] *Id.* (citing *U.S. v. Paul*, 274 F.3d 155, 167 (5th Cir. 2001), *quoting U.S. v. Gallo*, 20 F.3d 7, 12 (1st Cir. 1993)).

activities the categories encompass.'"[96]

Mr. Spann testified in response to questions posed by the court that, in his mind, hunting involves carrying and shooting a weapon at wildlife. But, as a matter of law, hunting isn't limited to the precise act of pulling the trigger on a gun or using a bow and arrow to shoot at wildlife. Rather, as discussed in detail below, hunting has been defined as searching for or pursuing wildlife. The broad legal definition of hunting shouldn't come as any surprise to Mr. Spann, who has hunted throughout the United States (indeed, internationally) and whose entire livelihood depends on the notion that he's an expert on getting in the right position to pull the trigger or shoot the arrow. Having closely observed Mr. Spann while he testified, the court has considerable reservations about the credibility of his stated belief that hunting only involves carrying and shooting a gun at wildlife. For the sake of its rulings in this case, the court will essentially accept Mr. Spann's legal position that he acted with an empty head and white heart. But legally, Mr. Spann's subjective intent is irrelevant to whether he engaged in activity that violated the conditions of probation. His subjective intent at most is relevant to how to deal with any violation that's found. That is, in this situation there's no requirement of mens rea or specific intent to violate one's probation. In the post-conviction context, similar to the pre-conviction situation in most cases, ignorance of the law—whether willful, wanton, or just negligent—isn't a legitimate excuse for illegal behavior, because people are expected

---

[96] *Id.* (citing *Paul*, 274 F.3d at 167).

to make themselves aware of the laws which apply to them.[97]  At oral argument, the court invited Mr. Spann to submit any authority for the proposition that there's a requirement of mens rea or specific intent in this situation, but none has been timely provided.[98]

As mentioned above, hunting has been interpreted by federal courts to mean searching for or pursuing wildlife.[99]  This interpretation has been held to be consistent with the word's ordinary meaning.[100]  For example, in *United States v. Jarrell*, the government's only evidence that a defendant was hunting was a videotape that showed him and two other men walking through a park, at least one with a firearm, with several dogs on leashes and at least one unleashed dog wandering through the park.[101]  Based upon this evidence, the magistrate judge in *Jarrell* held that it was beyond a reasonable doubt the defendant was hunting.[102]  On appeal, the district court affirmed this holding.[103]

---

[97] *U.S. v. Doyle*, No. 3:10-cr-42 (DCB) (LRA), 2010 WL 2925388, at *3-4 (S.D. Miss. July 20, 2010) (supervised release case).

[98] *See* doc. 42.

[99] *See U.S. v. Jarrell*, 143 F. Supp. 2d 605, 608 (W.D. Va. 2001) (interpreting "hunting" under 16 U.S.C. § 403c-3, which prohibits hunting in Shenandoah National Park, as searching for or pursuing wildlife with the purpose of killing, wounding or capturing); *see also U.S. v. Sanford*, 547 F.2d 1085, 1091 (9th Cir. 1976) (defining "hunt" as the general pursuit of wild animals or game, adopting substantially similar definition of "hunt" upon examination of identically-worded statute, 16 U.S.C. § 26, which prohibits hunting in Yellowstone National Park, and holding that hunting guides, as well as hunters themselves, could be convicted of "hunting").

[100] *Jarrell,* 143 F. Supp. 2d at 608 (citing Webster's Third New International Dictionary 1103 (1961) (defining "to hunt" as "to follow or search for (game or prey) for the purpose of and with the means of capturing or killing: pursue (game or prey) for food or in sport … esp: to pursue with weapons and often with trained animals"); *see also Sanford*, 547 F.2d at 1091.

[101] *Jarrell*, 143 F. Supp. 2d at 608.

[102] *Id.*

Similar to the evidence in *Jarrell*, in the present case Mr. Spann was caught on a surveillance video along with other men walking through a hunting location. In addition, Mr. Spann was dressed in camouflage, a turkey vest, and wearing binoculars around his neck. Although there's no evidence that Tennessee fish and game officials got a warrant for this surveillance, the so-called exclusionary rule that would provide a criminal defendant a remedy for any Fourth Amendment violation doesn't apply to probation revocation proceedings.[104] Although the *Jarrell* court concluded one need not actually kill, wound, or capture an animal to be "hunting," the video of Mr. Spann showed him and two other men departing a hunting location with a dead turkey in hand.

Even if Mr. Spann acted only as a guide to the other men he took out to hunt his properties (and he freely admits to this much), his actions still constitute "hunting." In *United States v. Sanford*, the issue before the court was whether a hunting guide's actions constituted "hunting."[105] The court held that "hunting" refers to the search for and pursuit of game and the guide "is the member of the party most directly concerned with the search for and pursuit of game."[106]

The foregoing cases make clear it's not necessary for Mr. Spann to be armed or to actually kill an animal in order to be "hunting." It's sufficient that he participated in a

---

[103] *Id.* at 609.

[104] *See U.S. v. Finney*, 897 F.2d 1047, 1048 (10th Cir. 1990); *see also U.S. v. Quinn*, Nos. 01-20122-JWL & 06-3262-JWL, 2007 WL 437734, at *4 (D. Kan. Feb. 6, 2007).

[105] *Sanford*, 547 F.2d at 1090-91.

[106] *Id.* at 1091.

hunt, dressing in camouflage and other hunting equipment in order to pursue animals for himself or others to kill.

The courts in both *Sanford* and *Jarrell* interpreted "hunting" within the specific context of federal statutes. However, Mr. Spann's activities meet other definitions of hunting as well. "Hunt" has been defined broadly by some dictionaries to include the general pursuit of wild animals or game.[107] The Tenth Circuit has defined "hunting" as "the recreational pursuit of game for meat and sport."[108] The National Park Service's regulations define "hunting" as "taking or attempting to take wildlife," and "taking" as "to pursue, hunt, harass, harm, shoot, trap, net, capture, collect, kill, wound, or attempt to do any of the above."[109] Similarly, in Tennessee, where Mr. Spann has lived and hunted all his life, the applicable statute provides:

> "Hunting" means chasing, driving, flushing, attracting, pursuing, worrying, following after or on the trail of, searching for, trapping, shooting at, stalking, or lying in wait for, any wildlife, whether or not such wildlife is then or subsequently captured, killed, taken, or wounded and every act of assistance to any other person, but "hunting" does not include stalking, attracting, searching for, or lying in wait for, wildlife by an unarmed person solely for the purpose of watching wildlife or taking pictures of wildlife.[110]

Even the physical conduct that Mr. Spann has admitted (e.g., setting out a turkey decoy in a field and using a calling device while turkeys were still in clear view on the

---

[107] *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1191 (10th Cir. 2013) (citing Oxford English Dictionary (2d ed. 1989) (defining "hunt" as "to go in pursuit of wild animals or game")).

[108] *Id.*

[109] *Id.* (citing 36 C.F.R. § 1.4(a)).

[110] Tennessee Code Annotated at § 70-1-101(19).

hunting field), falls squarely within the broad purview of "hunting" as that term is defined *both* in Tennessee and under federal law.

Indeed, Mr. Spann's esteemed counsel in this case have been unable to point to *any* jurisdiction in the United States that defines hunting as narrowly as their professional-hunter client. As earlier indicated, the evidence shows without dispute that Mr. Spann has hunted throughout this country and also internationally, and that he's no stranger to the fact that hunting is an activity heavily regulated by these various jurisdictions. Especially given (1) the hunting-related nature of Mr. Spann's recent conviction, (2) the court's explicit admonition at sentencing about the importance of Mr. Spann consulting his supervising probation officer and lawyers about hunting-related activities while on probation, and (3) Mr. Spann's ready access to lawyers in both Tennessee and in this court to advise him on such matters, it's a bit of a stretch for Mr. Spann to suggest that he somehow was free while on probation to define hunting however *he* saw fit. Mr. Spann ignored the court's admonishment—he contacted neither his supervising probation officer nor his lawyers in this case before engaging in the activities that led to the filing of the instant revocation petition. So, while some in the hunting community might rightly complain that it's difficult (or even too difficult) to comply with the technical aspects of hunting laws in the various states, it's pretty obvious here that Mr. Spann proceeded at his own peril. Despite the state of the record in this case, the court has given Mr. Spann the benefit of the doubt and refrained from finding him to be a liar on the issue of whether he believed in his own mind that he unlawfully hunted while

on probation.  But the most charitable thing that can be said here is that, whatever Mr. Spann's purported prowess out in the field might be, when it comes to making any reasonable effort to comply with the applicable laws, hopefully he's among the most careless of hunters.

Independent of Mr. Spann's hunting, the evidence shows that Mr. Spann violated his probation by committing a new state crime.  Tennessee Wildlife Resources Commission Proclamation 12-05, Section II, ¶5, states, "No person shall make use of bait to take wildlife unless the bait has been removed and any electronic feeder disabled at least 10 days prior to hunting."  Mr. Spann illegally had turkey bait distributed by one of his employees, Mr. Southerland, at hunting properties to which he had access.  Mr. Southerland testified that during the approximately five years he was employed by Mr. Spann it was not uncommon for Mr. Spann to instruct him to bait turkey hunting fields even in close proximity to hunting season.

Mr. Southerland testified he was specifically instructed by Mr. Spann on April 5, 2013, to distribute scratch grain as turkey bait at the Graveyard and the Park where Mr. Spann frequently hunted.  Although the parties disagree about the full nature and extent of Mr. Spann's involvement, there's no dispute that about a week later, on April 13, 2013, Mr. Spann accompanied Mr. Norwood to those two fields to hunt turkeys.  In contrast to what Mr. Spann said about whether his activities while on probation constituted hunting, he admits he knew it was against Tennessee law to hunt on a baited field within ten days of such grain being laid out.

Mr. Spann argues for a variety of reasons that Mr. Southerland's testimony lacks credibility. Most significantly, Mr. Spann asserts prejudice arising out of their soured employer-employee relationship. Further, Mr. Spann implies Mr. Southerland may have harbored some kind of grudge because Mr. Spann previously had declined to promote a hunting business venture Mr. Southerland had with a Tennessee wildlife official. Having carefully observed both Mr. Southerland and Mr. Spann while testifying on this particular point (which is one of the two most crucial points in the case), and having weighed their testimony in light of the record as a whole, the court finds Mr. Southerland very credible and Mr. Spann not credible. Significantly, Mr. Southerland's testimony that he baited the properties was credibly corroborated by the Tennessee wildlife officials who testified that they personally observed turkey bait on those properties during their covert investigative work on this case.

The court assumes Mr. Spann testified truthfully about *some* things involved in this case. But it's very difficult to put much stock in most of what he says. First, although Mr. Spann may not be atypical in the reality TV business in this regard (whether the shows involve bachelorettes, stranded survivors on faraway islands, or hunting game in the wild), his basic business model is inconsistent with the notion of always telling the truth. As was testified at some length by Mr. Spann,[111] his former videographer (Mr. Southerland),[112] and especially his current videographer (Mr. Dotson),[113] the line between

_____

[111] Tr. Vol. 2 at 60-62.
[112] Tr. Vol. 1 at 93.

what really happens during Mr. Spann's various televised hunting exploits, versus what "could've happened" as recreated during post-kill "cutaway" filming, is so obscured through artistic and editing processes that nobody watching the final cut on TV can tell the difference.

And second, in a related vein as relates to Mr. Spann's credibility, the record contains a fair amount of facially incriminating transmissions directly or indirectly attributed to Mr. Spann via Facebook postings and text messages about him being involved in hunting while on probation. According to Mr. Spann and his wife, he's computer-illiterate and none of these factually inaccurate postings were made by Mr. Spann—instead, the postings were made by Mrs. Spann, other members of the family, or business associates. Taking at face value the testimony of Mr. Spann and the other witnesses whom he called on this issue, they would have the court believe that virtually everything that appears on Mr. Spann's Facebook page and text messages is essentially make-believe. Notably the record is devoid of any reasonably contemporaneous objection or disavowal by Mr. Spann of the postings, who presumably would have some concern they might later result in him going to prison for violating probation. To be sure, Mr. Spann can't be the only so-called celebrity who has others handle such things for marketing and merchandising objectives that may be entirely legitimate. Regardless of whether these make-believe social media postings might concern Mr. Spann's hunting sponsors (or should concern his hunting fans), this way of doing business does fairly call

---

[113] *Id*. at 323-28.

into question whether Mr. Spann has any difficulty with creating and maintaining a public persona that's based on fabrication instead of truth.

Mr. Spann seems to have a stable, loving family, is unquestionably successful in business, is meaningfully involved with a local charity, and appears to be well-liked by some minor celebrities and some of his peers in the professional hunting community. These, of course, are all commendable things. But basically what Mr. Spann has asked the court to do here is ignore a mountain of incriminating evidence and then take his word that he's telling the truth about not hunting or baiting turkeys, even though his basic way of doing business depends on subtle deception. Given the record presented, the court respectfully submits that Mr. Spann asks too much.

Mr. Spann demonstrated no remorse for his conduct during the recent hearings in court. Other than grudgingly admitting that perhaps he committed a technical violation of Tennessee hunting laws by setting up a decoy in a field (supposedly because the decoy was broken and his unverified assumption that hunters whom he accompanied wouldn't have been able to set it up themselves), Mr. Spann refused to accept responsibility for his conduct, particularly with regard to the baiting of turkeys. As earlier indicated, the court ultimately declined but came very close to finding that Mr. Spann knowingly gave false testimony under oath in this case. Simply put, the court finds Mr. Spann's attitude about this entire matter to be arrogant.

Based on the violation report, the evidence presented, and the previously stated findings of fact and conclusions of law, the court rules by a preponderance of the

evidence that Mr. Spann violated the terms of his probation by: (1) hunting in the United States within six months from the date of his sentencing; and (2) independent of the first violation, by baiting turkeys, which is a crime under Tennessee law.

The question remains of what to do with Mr. Spann. The court has considered the nature and circumstances of the above-described violations, the personal characteristics of Mr. Spann, and the sentencing objectives and factors required by 18 U.S.C. § 3553(a). The court has also considered the advisory, non-binding Chapter 7 policy statements issued by the Sentencing Commission under 28 U.S.C. § 994(a)(2). In this regard, the parties agree that, assuming the court finds a violation, it arises out of a misdemeanor and thus is a Grade C violation (the lowest level) under the Sentencing Guidelines. There's no dispute Mr. Spann falls into Criminal History Category I (the least serious category). Under these circumstances, the Sentencing Guidelines suggest (but don't require) a custodial sentence of three to nine months.

The court declines to adopt the recommendation of the supervising probation officer in her petition that Mr. Spann's probation be *revoked*. Likewise, the court declines to follow the government's suggested disposition, i.e., that Mr. Spann's probation be *modified* in two specific respects, i.e., by sending him to prison for three months and prohibiting him from hunting anywhere until his current term of probation expires on February 28, 2016.

Mr. Spann has argued that, assuming any probation violation is found, no time in custody is appropriate and "a minimal extension of the no hunting condition is the

27

punishment that meets the offense."[114]  The court respectfully and strongly disagrees.

Mr. Spann's quick and flagrant violation of the fairly lenient conditions of probation the

court set before calls for custodial consequences *and* a significant modification (i.e.,

extension) of the no-hunting ban.  Because of the likely financial ramifications of the

extended no-hunting ban, the court is departing downward quite a bit from the low end of

the three to nine month custodial sentence suggested by the Sentencing Guidelines.

## V.  Order and Judgment

Mr. Spann shall remain on probation until February 28, 2016 on all the conditions

previously imposed.[115]  The court exercises its discretion under 18 U.S.C. §§ 3563(b)(10)

& 3563(c) to modify the conditions of Mr. Spann's continued probation, as follows: (1)

as an additional condition, between now and the one-year anniversary of Mr. Spann

originally being placed on probation (February 28, 2014), Mr. Spann shall remain in the

intermittent custody of the Bureau of Prisons for a total of thirty days during nights and

weekends, or other intervals of time not to exceed ten days, as directed by Bureau of

Prisons' officials, in consultation with U.S. Probation Office officials; and (2) Special

Condition No. 3 of Mr. Spann's probation[116] is modified as follows: "The defendant shall

not hunt anywhere in the United States, *or anywhere else in the world*, until August 1,

2014."

IT IS SO ORDERED.

---

[114] Doc. 35 at 4.
[115] Doc. 28 at 2-3.
[116] *Id*. at 3.

Dated July 30, 2013, at Kansas City, Kansas.

s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge